**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

PETER BORMUTH,

      Plaintiff,

v.                                   Case No. 12-11235

CITY OF JACKSON, et al.,

      Defendants.

_____/

**OPINION AND ORDER ON SUMMARY JUDGMENT MOTIONS**

*Pro se* Plaintiff Peter Bormuth sues for alleged wrongs arising from Bormuth's

failed attempt to perform at a poetry reading hosted by Jackson Community College

(JCC).  A November 13, 2012, order resolved several pending motions and directed

further briefing.  This order addresses the supplemental briefing and continues to

narrow the issues in dispute.  Each matter addressed is fully briefed, and no hearing is

needed.  *See* E.D. Mich. LR 7.1(f)(2).

**I.  BACKGROUND**

The November 13 order states in detail the pertinent background.  (Dkt. # 81

Sec. I, 2012 WL 5493599 *1-2.)  In short: Bormuth performed during "open mic" at a

"JCC Poetry Night" held in a private restaurant but hosted by a JCC instructor, John

Yohe, and sponsored by JCC.  In an email to Bormuth, Yohe said he approved of

Bormuth's poetry; but Yohe, it seems, later became increasingly annoyed with—or

alarmed by—Bormuth, and eventually told Bormuth not to attend another poetry night.

Several months later Bormuth threatened JCC with a discrimination lawsuit.  A JCC

dean, Todd Butler, told Bormuth that only Yohe decided who performed at each poetry night but that only innocuous factors, such as the press of time, influenced Yohe's decisions.  Bormuth went to the next poetry night and was arrested.  He was tried but acquitted of trespassing.

In response to these events, Bormuth sued Yohe, Butler, JCC, the City of Jackson, two Jackson police officers, and a Jackson city attorney.  The November 13 order dismissed with prejudice the action against the police officers and dismissed with prejudice each claim under 42 U.S.C. § 1983 against Jackson and the Jackson city attorney.

The order also directed Bormuth to state clearly each claim he asserts against each defendant.  In a supplemental paper (Dkt. # 84), Bormuth responded that he asserts: (1) a claim under 42 U.S.C. § 1983 for violation of the First Amendment (as incorporated by the Fourteenth Amendment) against JCC and, as both officials and individuals, Yohe and Butler; (2) a claim for violation of Title II of the Civil Rights Act of 1964 against JCC, Jackson, and Butler; (3) a claim for violation of the Elliott-Larsen Civil Rights Act against JCC, Butler, and the Jackson city attorney; and (4) a claim for slander and libel against Yohe.  Bormuth asserts the claims that the November 13 order dismissed, but those claims need no more attention.

The November 13 order also directed JCC and Yohe to submit a paper addressing:

> (1) whether JCC's hosting the poetry reading meant that the private restaurant became a traditional or limited public forum, (2) if the restaurant was a public forum, what Bormuth needs to prove to establish a Section 1983 claim against JCC or Yohe, and (3) why Bormuth can or cannot prove a claim against JCC or Yohe.

2

(Dkt. # 81 at 10.)  Yohe and JCC complied, and Bormuth responded.  (Dkts. # 82, 85.)

## II.  STANDARD

Most of the matters addressed below involve summary judgment.  Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if "a reasonable jury could return a verdict for the non[-]moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court must draw each reasonable inference in favor of the non-moving party.  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## III.  DISCUSSION

### A.  First Amendment Right to Free Speech

Bormuth has moved for summary judgment on his First Amendment claim, (Dkt. # 78); JCC, Yohe, and Butler submitted a short response, (Dkt. # 83); JCC and Yohe have moved for summary judgment on the claim in their response to the November 13 order (Dkt. # 82); and Bormuth has responded.  (Dkt. # 85.)

When performing at the JCC poetry nights Bormuth raised a singular array of topics and opinions but primarily addressed and mocked Christianity and Christian morality.  (*Id.* ¶ 10.)  Bormuth contends that Yohe banned Bormuth from the poetry nights because of Bormuth's antipathy toward Christianity.  (*E.g.* Dkt. # 78 at ¶¶ 18, 26-28, 30.)  But as the November 13 order observes, "The available evidence . . . suggests strongly that Yohe's banning Bormuth had nothing to do with Bormuth's poetry or religion or anti-religion."  (Dkt. # 81 at 7-8.)  In an early email to Bormuth, Yohe said that

he was "no fan of Christianity either" and that he and others enjoyed Bormuth's poetry. (Dkt. # 78 Ex. 2, email 3.)  No evidence even obliquely suggests that a Defendant either cared much about Bormuth's opinions or wanted to suppress them.

Bormuth argues also, however, that Yohe could not ban Bormuth merely because Yohe disliked Bormuth's displays of "Pagan living pride."  (Dkt. # 78 at ¶ 23.) Bormuth says he "believes in Pagan living pride, not Christian humility . . . ."  (Dkt. # 78 at 7.)  Bormuth sent Yohe statements such as this:

> There are not that many druidic bards who practice the oral tradition and even fewer who know the history of the tribes or speak for the beings this society denies a voice. . . .  I endeavor to teach every time I take the stage.

(*Id.*, Ex. 2, email 10.)  Although the record contains little evidence of Bormuth and Yohe's face-to-face conversation, Bormuth's papers in this action confirm that he assiduously avoided humility, Christian or other.  *See*, *e.g.*, (Dkt. # 51 at 44, Ex. 2b) (calling an attorney a "fascist Christian"); (Dkt. # 78 at 4) ("[A]nother open mike reader had been a woman who read overtly Christian poems with juvenile rhyme schemes in a stuttering sing song voice.") (Dkt. # 47) ("You christians would like to claim that anyone who does not believe your evil jesus myth is mentally deranged[.]"); (Dkt. # 30 at 5) ("Both this Court and Plaintiff know that [the judge] is going to do everything he can to derail and destroy this pleading.").

Defendants claim that Yohe expelled Bormuth from the poetry nights because Yohe feared Bormuth would act disruptively, but no evidence yet presented shows that Bormuth spoke out of turn or otherwise created disorder before Yohe banned him. Further, in the email telling Bormuth to stay away, Yohe wrote, "The reason people don't like you is not because you're anti-christian, but because you're an arrogant asshole."

4

(Dkt. # 78, Ex. 2, email 11.)  The record allows, at least, the inference that Yohe banned Bormuth for being boorish.

The pertinent issue, then, is how the First Amendment governs a ban based on personal animosity.  On that topic, JCC, Yohe, and Butler say little.  Although they concede that each poetry night constituted a public forum, they otherwise fail to discuss the alleged violation of the First Amendment.  They merely assert without authority that each claim under Section 1983 fails unless Bormuth proves he suffered religious discrimination.  In response, Bormuth says that he need not establish religious discrimination to establish a violation of his right to free speech.  He claims that he must prevail if Yohe, for whatever reason, blocked him from speaking at a public forum.  But Bormuth discusses no helpful authority, either.  The parties' briefing leaves the matter obscure.

The most informative case revealed by judicial research is *Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011).  In *Surita*, a protestor confronted and criticized a city employee:

> [The city employee then] reported to [the mayor] that [the protestor] had been very angry, "got in her face," and caused her to fear that he would attack her physically.
>
> The [city council] set aside ten minutes at the end of each of its bimonthly meetings for "audience time."  Any member of the public could talk for up to three minutes, on any subject.  The mayor was presiding officer and chair of the meetings.
>
> At a [subsequent] meeting . . , [the mayor] told [the protestor], as he stood at the microphone during audience time, that he would not be allowed to speak until he apologized to [the city employee]. . . .  [So the protestor] did not speak at the city council meeting.

665 F.3d at 866.

5

Again, the defendants in this action argue weakly that Yohe banned Bormuth to prevent a disturbance. *Surita* addressed a similar situation:

> [The mayor] argues his bar on [the protestor's] speech was a permissible time, place or manner restriction because he believed [the protestor] had addressed [the city employee] threateningly. However, content neutrality is a basic requirement of a time, place or manner restriction, and the barring of [the protestor's] speech was not content neutral. . . .
>
> [The mayor] barred anything and everything [the protestor] proposed to say at a public meeting. . . . Restrictions that favor or disfavor certain speech based on the speaker rather than the content of the message are still content based. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1265 (11th Cir. 2005). . . . The Supreme Court has rejected the argument that a First Amendment violation requires an intention to suppress certain ideas. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). . . . When [the mayor] intentionally barred [the protestor] from speaking he barred the content of [the protestor's] speech, regardless of whether he agreed or disagreed with the viewpoint [the protestor] was going to expound. . . .
>
> Viewing the facts in [the protestor's] favor, his speech [to the city employee] was not threatening. But even if [the protestor] threatened [the city employee] as [the mayor] may have been told, nothing in the record indicates that [the protestor's] proposed speech at the city council meeting would be threatening. Therefore, [the mayor impermissibly] used [the protestor's] speech to prohibit subsequent protected speech.

665 F.3d at 870-72.

JCC, Yohe, and Butler concede that Bormuth was excluded from the poetry nights because of his "attitude and demeanor." (Dkt. # 83 at 2.) As in *Surita*, in this action a defendant barred a person from speaking at a public forum because—at least, arguably because—he disliked the person. As *Surita* shows, a personal aversion is not a constitutional ground for expelling someone from a public forum.[1] Yohe and JCC's

---

[1] *Surita* involved a "designated public forum"—a space that the government opens broadly to public speech on many topics. *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010). This action involves, at most, a "limited public forum"—a space "limited to use by certain groups or dedicated solely to the discussion of certain

2:12-cv-11235-RHC-LJM   Doc # 86   Filed 01/17/13   Pg 7 of 13   Pg ID 1440

motion for summary judgment therefore fails.

Meanwhile, however, Bormuth leaves the court with no confidence that he is entitled to judgment as a matter of law. His papers assert much but explain little. For example, Bormuth says that he is entitled to summary judgment if he shows, among other things, that he "made a polite request to have his name put on the open-mic list which caused John Yohe to demand that [Bormuth] be removed from the Poetry Event." (Dkt. # 85 at 2.) But here is the attendant analysis:

> "If the speech does fall within an acceptable subject matter otherwise included in the forum, the State may not legitimately exclude it from the forum based on the viewpoint of the speaker." *Cogswell v. City of Seattle*, 347 F.3d 809 (9th Cir. 2003). "The danger of censorship and of abridgement of our precious First Amendment freedoms is too real where officials have unbridled discretion over a forum's use." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 533 (1975); *see also Domrowski v. Pfister*, 380 U.S. 479 (1965) ("[T]he threat of criminal prosecution effectively chills the exercise of free expression.").

(Dkt. # 85 at 6) (emphasis removed and formatting normalized). These quotes lack necessary context and elaboration. They also beg the question: the issue in dispute is what it means, in this specific instance, to exclude a speaker based on his viewpoint and what it means, in this specific instance, for an official to abuse his discretion to regulate speech in a forum.

Similarly incomplete analysis follows most of Bormuth's assertions. As a result, Bormuth cannot establish the absence of a material dispute of fact, and his motion fails.

---

subjects." *Id.* Limits on speech in a designated public forum need to satisfy strict scrutiny, whereas limits on speech in a limited public forum need merely to satisfy reason and maintain viewpoint-neutrality. *Id.* The more lenient standard for limiting speech in a limited public forum provides no assistance to Defendants because a jury may rightfully find that Bormuth encountered an unreasonable limitation.

7

## B.  Religious Discrimination

"Because [he] is facing a hostile and biased Court," Bormuth says in his response to the November 13 order, "he has hesitated" to raise alleged misbehavior during discovery by counsel for Yohe, Butler, and JCC.  (Dkt. # 85 at 11.)  But, Bormuth continues, because counsel "has successfully obstructed [Bormuth's] attempt to build his religious discrimination case," Bormuth seeks to move under Federal Rule of Civil Procedure 41(a)(2) to dismiss without prejudice each claim under the Civil Rights Act of 1964 and the Elliott Larsen Civil Rights Act.

Bormuth's proliferating assertions of judicial hostility notwithstanding, his allegations of bias have already received sufficient attention.  They are meritless. (*See* Dkts. # 14, 23, 39, 48.)   If Bormuth's accusations against counsel are to be addressed, he must confront such wrongdoing in a motion seeking direct and apt relief.  Bormuth's attempted motion, bearing a resemblance to gamesmanship, neither impeaches counsel's integrity nor is effective in gaining Bormuth a tactical advantage.

To procure a voluntary dismissal, Bormuth must request dismissal in a separate motion, so that his opponents may both state whether they consent and enjoy a proper opportunity to respond.

## C.  Slander and Libel

Bormuth moves for summary judgment on his state law claim for slander and libel against Yohe, who responds.  (Dkts. # 59, 66.)

Bormuth's claim stands on four statements by Yohe that appeared in a January 11, 2012, article, published in the *Jackson Citizen Patriot* and on mlive.com, about Bormuth's poetry-night arrest: (1) "[Bormuth] was getting belligerent and rude"; (2)

8

"I was perfectly within my rights to ask him not to come anymore . . , the JCC lawyer confirmed that"; (3) "[Bormuth] said he was an atheist at the readings"; (4) "The e-mails [between Yohe and Bormuth] were about how I was running things or why he read second instead of first during open-mic.  Stuff like that."  (Dkt. # 59 at 13-14.)

Only a falsehood can defame.  *Restatement (Second) of Torts* § 558 (1977).  If Yohe's comments involved a matter of public concern, Bormuth must bear the burden of showing that Yohe spoke falsely.  *See Roach v. Enquirer & News of Battle Creek*, 398 N.W.2d 245, 266 (Mich. 1986); 50 Am. Jur. 2d *Libel & Slander* §§ 106, 115 (2012).  A person who "thrust[s] himself to the forefront of a particular public controversy" and "invite[s] attention and comment" becomes a public figure speaking about a matter of public concern.  *Hayes v. Booth Newspapers, Inc.*, 295 N.W.2d 858, 866 (Mich. Ct. App. 1980).  That well describes Bormuth.  He told Yohe, "[I] will do everything [I] can in this life and possible future lives to destroy the faith of jesus christ," (Dkt. # 78, Ex. 2, email 2); hence his vigorous campaign—his apologia for a local newspaper, his acerbic asides in his litigations, his book, "GOD DID IT: the words and deeds of the followers of Jesus Christ," and, of course, his performances of polemical poetry.  (*See* Dkt. # 26 at 3; Dkt. # 59 at 13-18.)  He, as a public figure, bears the burden of establishing falsity.

Yohe notes, correctly, that the law of libel and slander observes the fact-value distinction, which holds that only a statement of fact can be proven false.  *See Ireland v. Edwards*, 584 N.W.2d 632, 637 (Mich. Ct. App. 1998).  For this reason, Bormuth cannot establish that the opinion "[Bormuth] was getting belligerent and rude" is false.  Yohe's intuition about what counts as belligerent or rude is not subject to empirical refutation.  *Cf.* R. Posner, *The Problematics of Moral and Legal Theory* 60 (1999) ("You cannot

9

show me that my intuition is an illusion, like the apparent movement of the sun or the bent appearance of a straight stick in water.  There are no 'crucial experiments,' and no statistical regularities, by which to validate a moral argument.")

Although a somewhat closer question, Yohe's statement that he "was perfectly within [his] rights . . ." seems not much more than opinion.  A court might write an opinion about the law that contradicts Yohe's opinion; and, obviously, the court's opinion would govern and render Yohe's claim "false," at least in a shallow, predictive-theory-of-law sense, *see* O.W. Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457 (1897); but Yohe's opinion remains immune from falsification in an empirical sense.  "It is a commonplace among lawyers that even a fool-proof case can be lost once it gets into court."  *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 781 (9th Cir. 1990) (Kozinski, J., dissenting).  Unlike the basics of gravity or the date of the Battle of Hastings, law is in large part a matter of interpretation.

The other two statements involve facts.  Yohe says that he merely "interpreted" what Bormuth said during a conversation and that he provided merely a "subjective opinion" about the content of Bormuth's emails, but these claims conflate an opinion about a value and a conjecture about a verifiable fact.  Bormuth either said he was an atheist, or he did not; either he asked why he read second at a poetry night, or he did not.  The statements raise facts, and, further, Bormuth arguably can show that Yohe stated the facts inaccurately.

The obvious issue, in turn, is whether Bormuth can establish that the statements damaged him.  Bormuth never explains how the statement "He'd said he was an atheist" caused him harm.  For reasons that will become clear momentarily, no attentive

10

person reading the article at issue could miss that Bormuth claims to be a Pagan and

that Yohe almost certainly misunderstood or oversimplified what Bormuth said.  In any

event, Yohe's mistake, if it was a mistake, was inconsequential.

Bormuth claims that the statement implying he wanted to read first depicted him

as a "prima donna."  Although Bormuth expects the reader to draw a subtle inference,

the article, discussing another of Bormuth's lawsuits, diminishes the effect of subtlety:

> Bormuth has filed at least two lawsuits against the Dahlem Conservancy, a
> private nonprofit organization that leases property from JCC. . . . [The] case
> . . . stems from his criticism of management for having the staff use diesel-
> fueled motorized carts as transportation. . . .

> Bormuth's ongoing correspondence with Dahlem Executive Director Brad
> Whaley on the matter eventually led Whaley to ban Bormuth from the
> property.  According to court papers, Whaley thought Bormuth made a
> threatening comment toward an employee in an email sent through the
> conservancy's website.

> Bormuth's comment was included in the Dahlem Center's motion to dismiss:

> "tell your groundsman that the next time i see him driving that diesel cart just
> because he is too lasy (sic) to walk i will either have the spirits drop a widow
> maker on him putting him in a wheel chair the rest of his life or since diesel
> fuel is a known cause of bladder cancer I will have the spirits send him an
> appropriate dose."

> When Whaley questioned Bormuth about his statement via email, Bormuth
> stated he was a Pagan, and what he said was "symbolic speech or prayer
> (that) is known as a curse in Pagan terminology." . . .

(Dkt. # 59 at 13-14); *see Bormuth v. Dahlem Conservancy*, 837 F.Supp.2d 667 (E.D.

Mich. 2011) (dismissing Bormuth's action), *aff'd*, 11-2070 (6th Cir. Oct. 9, 2012).  No

reasonable person would remain impassive while reading the balance of that article but

then pass a harsh judgment based on a statement about the order of readings during

open mic.  In other words, Bormuth cannot establish that Yohe's statement harmed his

11

reputation or caused him other damage.  *See Ireland*, 584 N.W.2d at 636.  The claim for slander and libel fails.

## IV.  CONCLUSION

IT IS ORDERED that Bormuth's two motions for partial summary judgment [Dkts. # 59 & 78] are DENIED.

IT IS FURTHER ORDERED that Defendants' request for partial summary judgment [Dkt. # 82], brought pursuant to the court's November 13, 2012 order, is GRANTED IN PART and DENIED IN PART.  It is GRANTED as to Defendant Yohe on the slander and libel claim and DENIED as to the Section 1983 First Amendment claim. A judgment for Yohe will issue on this claim at the conclusion of the litigation.

IT IS FURTHER ORDERED that Bormuth's request to dismiss voluntarily, found within his December 4, 2012, response, is DENIED.  Bormuth may submit a motion under Rule 41(a)(2) by **January 29, 2013**.  The court reserves ruling on Defendants' request for summary judgment on the religious discrimination claims pending the submission of both Bormuth's anticipated Rule 41 motion and a response.


 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  January 17, 2013


I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, January 17, 2013, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C2 ORDERS\12-11235.BORMUTH.summj.ckb.RHC.wpd

13